[No. B172858. Second Dist., Div. Three. Feb. 4, 2005.]

ELECTRICAL ELECTRONIC CONTROL, INC., Plaintiff and Respondent,
v.
LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

602

## COUNSEL

Law Office of Bergman & Dacey, Gregory M. Bergman, John P. Dacey, Mark W. Waterman and Beth D. Orellana for Defendant and Appellant.

Law Office of Kinley and Styskal, Thomas G. Styskal and Anne K. Styskal for Plaintiff and Respondent.

## OPINION

**CROSKEY, J.**—A public entity awarded a public works contract to a contractor. Although the contract documents required the contractor to provide a payment bond for the protection of its subcontractors, as required by law, the contractor did not provide a bond. The contractor began work on the project and failed to pay its subcontractors. The public entity subsequently terminated the contractor from the project, and the public works contract was assigned, with the consent of the public entity, to a replacement contractor. A subcontractor who had not been paid by the initial contractor brought suit against the public entity, alleging the public entity was liable for its negligence in allowing the initial contractor to commence work without having furnished a payment bond. The public entity acknowledged the initial contractor did not furnish a bond. However, the public entity sought judgment in its favor on the basis of a payment bond furnished by the replacement contractor when it, several months after the first contractor's default, took over work on the public works contract. The trial court concluded the public entity had failed to establish the replacement contractor's bond applied to claims of subcontractors whom the initial contractor had failed to pay. Based on this ruling, the parties entered into a settlement for a stipulated judgment, providing for appellate court review of the trial court's ruling. We agree with the trial court. The public entity also challenges the trial court's ruling that the attorney fees incurred by the subcontractor in attempting to recover from other entities the amounts it was owed can be recovered as damages from the public entity under the "tort of another" theory. Here, we agree with the public entity and conclude the trial court erred. We therefore modify the judgment to delete the award of attorney fees and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

Los Angeles Unified School District (LAUSD) solicited proposals for "local area network (LAN) integration projects" at various schools. For purposes of this project, LAUSD grouped clusters of schools into separate "Packages." In 2000, LAUSD contracted with four different contractors, each of whom was given the contract for one or more Packages. Two of those contractors were Wareforce, Inc. (Wareforce), and Pacific Bell Telephone Company, doing business as SBC DataComm (SBC).

Pursuant to their contracts with LAUSD, and pursuant to statute (Civ. Code, § 3247), the contractors were required to obtain payment bonds for the benefit of their subcontractors. Wareforce failed to obtain a bond for its contract and LAUSD not only took no steps to force Wareforce to do so, it allowed the work to commence on the project and even made payments to the contractor, all without it having complied with the bonding requirement.

After work commenced on the LAN integration projects, Wareforce failed to pay its subcontractors. Ultimately, those subcontractors claimed Wareforce owed them a total amount in excess of $8 million. Included in that amount is approximately $350,000 owed to Electrical Electronic Control, Inc. (EEC), the eventual plaintiff in this action.

By May 21, 2001, EEC had completed its work on the Wareforce contract. In order to protect its right to payment, EEC had served stop notices on LAUSD, requiring LAUSD to withhold from payments due Wareforce sufficient funds to answer EEC's claims. Numerous other subcontractors had also served stop notices on LAUSD with respect to Wareforce's failure to pay them. The record is not clear as to whether LAUSD withheld sufficient funds to pay the claims of all of Wareforce's subcontractors.

By July 2001, it became clear that Wareforce could not complete the Packages it had contracted to complete. On July 9, 2001, an assignment agreement was executed by Wareforce, SBC and LAUSD pursuant to which the parties agreed that Wareforce would assign its contracts to SBC. However, SBC did not simply take over the terms of Wareforce's contracts. Instead, the parties agreed that the terms of SBC's previous contracts would apply. In other words, SBC would be assigned the contracts for Wareforce's Packages, but the contracts would be amended to incorporate the terms and conditions governing the Packages SBC had originally contracted to complete. The assignment included the right to any receivables Wareforce had

---

[1] There has been no adjudication of the merits of plaintiff's claims. We set forth the undisputed facts and, where necessary, the allegations of the parties.

outstanding. The assignment agreement acknowledged that LAUSD was limited in its ability to make payments while stop notices remained in effect. Therefore, SBC and Wareforce agreed to "use their best efforts to obtain appropriate releases and/or bonds for those stop notices prior to seeking any additional payments."

While the record is not entirely clear, it appears that there were additional agreements between SBC and Wareforce. SBC may have agreed to use Wareforce as a subcontractor on some of the assigned Packages. The record does not include the subcontract agreement; but LAUSD did submit a partially executed rider to that agreement. The rider states that SBC had agreed to assume over $8 million of Wareforce's payables, which were enumerated in an attached appendix, and included the debt owed EEC.[2]

In October 2001, SBC obtained two payment bonds from Travelers Casualty and Surety Company of America (Travelers). The bonds were intended to guarantee SBC's payment of its subcontractors on the two LAN installation projects SBC had undertaken. The first bond was intended to guarantee the work SBC had originally contracted to perform in July 2000. The second bond, which is the bond at issue in this case, was clearly intended to guarantee the work SBC undertook to perform when it accepted the assignment of the Wareforce contract. As we explain below, however, we are unable to conclude that the bond was intended to guarantee the performance of any other obligations SBC undertook via the assignment agreement, or any other contracts SBC simultaneously executed. Rather, it appears that the bond was only intended to guarantee SBC's payment of *its* subcontractors for the work it was to perform on the public improvement for LAUSD.

Time passed, and EEC remained unpaid. On November 8, 2001, EEC contacted LAUSD and requested a certified copy of Wareforce's payment bond. On November 14, 2001, EEC brought suit against Wareforce, SBC, LAUSD and Doe defendants. Most of EEC's causes of action were against Wareforce. As against SBC, EEC alleged SBC agreed to assume EEC's payables and that it was a third party beneficiary of that agreement. As against LAUSD, EEC sought to enforce its stop notices. On the chance that Wareforce had obtained a payment bond, EEC brought a cause of action on the bond against a Doe defendant, indicating it would amend the complaint when LAUSD identified the surety.

*In December 2001, LAUSD informed EEC that no payment bond was in existence,* although in fact SBC had obtained and filed the bond, on which

---

[2] Contrary to LAUSD's argument, SBC's agreement to assume Wareforce's payables was *not* part of the assignment agreement. It was referenced only in the partially executed rider to a subcontract agreement between SBC and Wareforce.

LAUSD would subsequently rely, in *October* 2001. In August 2002, EEC brought the instant action against LAUSD, for breaching its mandatory duty to require Wareforce to obtain a payment bond. The two cases were consolidated, although we will refer to the first action, filed on November 14, 2001, as the "underlying action."

SBC obtained a stop notice release bond. As a result, the stop notices were released and EEC dismissed LAUSD from the underlying action. SBC then settled the underlying action with EEC for an amount which was less than the amount owed EEC by Wareforce. As Wareforce had filed bankruptcy proceedings, the underlying action was stayed against it. The underlying action was effectively terminated by SBC's settlement. The only remaining litigation was EEC's current suit against LAUSD for negligently failing to require Wareforce to obtain a payment bond.

EEC also sought to recover its attorney fees in the underlying action as consequential damages in the instant action. LAUSD filed a pretrial motion to preclude EEC's recovery of attorney fees. EEC argued that, had LAUSD not failed to require Wareforce to post a payment bond, EEC would have been able to recover against the bond and would not have had to pursue the underlying action. The trial court agreed, concluding that attorney fees may be recoverable as damages under the "tort of another" doctrine, and indicated this would be a matter for the jury.

The case proceeded toward trial. On August 18, 2003, one week before trial, a pretrial hearing was held. At the hearing, LAUSD indicated, *for the first time,* that it had recently discovered that there was, in fact, an applicable payment bond. The parties agreed the issue would have to be briefed.

On August 22, 2003, LAUSD filed its motion "for judgment on the pleadings or to dismiss or, alternatively, . . . to try legal issue of coverage under payment bond." LAUSD took the position that a bond had been obtained on the public works project in question, and that, therefore, LAUSD did not breach its duty to require a bond. However, the bond on which LAUSD relied had not been obtained by Wareforce. Instead, LAUSD relied on the bond which had been obtained by SBC from Travelers in October 2001, *a few months after* Wareforce's default and the assignment of its contract to SBC. The bond was intended to guarantee payment "for all labor and material used or reasonably required for use in the performance of the Contract." The "Contract" was defined as a "written agreement dated July 13, 2001, . . . a contract with [LAUSD] for LAUSD II; Fiber LAN project . . . ." According to the declaration of Charles Sprick, an LAUSD employee, the term "LAUSD II" was used to refer to the contracts for the Packages

originally contracted to Wareforce and subsequently assigned to SBC, to distinguish them from LAUSD I, the contract for the original Packages SBC agreed to complete.

EEC opposed the motion on various grounds, including that the bond did not cover work performed prior to its issuance and that the bond had nothing to do with Wareforce.[3] LAUSD responded that the public works project for the Packages originally assigned to Wareforce is an indivisible whole, and that once SBC accepted the assignment, it stood in Wareforce's shoes, and its payment bond therefore applied to the entire project.

The trial court denied LAUSD's motion. The trial court concluded LAUSD did not present sufficient evidence for the trial court to conclude, as a matter of law, that the bond applied to Wareforce's defaults.

Based on the trial court's ruling, the parties stipulated to entry of judgment. The parties agreed that EEC was entitled to $500,000 in damages, including $80,000 for attorney fees in the underlying action. The parties stipulated to entry of judgment for EEC in the amount of $500,000. The parties further agreed that LAUSD would appeal the trial court's rulings regarding whether the bond covered EEC's claim and whether EEC was entitled to attorney fees as damages.[4] The parties agreed to pay their own costs on appeal.

Judgment was entered accordingly. LAUSD filed a timely notice of appeal.

## CONTENTIONS OF THE PARTIES

LAUSD contends the October 5, 2001 bond issued by Travelers to SBC provides coverage for EEC's claim it was not paid by Wareforce, based on

---

[3] EEC also emphasized that, even if the bond somehow did apply, LAUSD's delay in identifying it had effectively precluded EEC from pursuing a claim against the bond.

[4] Specifically, the agreement stated that LAUSD's appeal would address the following three issues: "A. Appeal from the Court's Ruling on September 17, 2003, on the Motion of defendant [LAUSD] for Judgment on the Pleadings or to Dismiss or, Alternatively, Motion to Try Legal Issue of Coverage Under Payment Bond as reflected in the Court Reporter's Transcript dated September 17, 2003. [¶] B. Appeal from the Court's denial of the Motion of defendant [LAUSD] for Judgment on the Pleadings or to Dismiss or, Alternatively, Motion to Try Legal Issue of Coverage Under Payment Bond, as reflected in the Court Reporter's Transcript dated September 17, 2003, with regard to the question of whether the Payment Bond, Exhibit No. 1079, was retroactive and effectively covered the claim of plaintiff [EEC] for work completed prior to the issuance of the purported Payment Bond, Exhibit No. 1079; and [¶] C. Appeal from the Court's Ruling on the Motion of [LAUSD] to try certain legal issues before the Trial of Issues of Fact, and specifically, the Court's Ruling that plaintiff [EEC] is entitled to recover its expenses for attorneys' fees as consequential economic damages under its Complaint for Negligence against defendant [LAUSD], said Ruling of the Court entered July 28, 2003 and reflected in the Court Reporters' Transcript of Proceedings for that date."

the terms of the bond itself and the law regarding payment bonds. EEC, on the other hand, contends that the bond covers only claims by subcontractors who provided work for SBC *after* the assignment, and does not retroactively reach Wareforce's defaults. The parties also dispute whether EEC is entitled to damages for its attorney fees under the "tort of another" theory.

## DISCUSSION

### 1. *Standard of Review*

■ Although LAUSD's dispositive motion sought alternative remedies, its purpose was clear: to seek a determination as a matter of law that the October 2001 bond obtained by SBC provided coverage for EEC's claim against Wareforce and therefore satisfied LAUSD's statutory duty to require a payment bond. Similarly, LAUSD appeals an adverse determination on its motion precluding EEC from recovering attorney fees as a component of damages. As these are questions of law, our standard of review is de novo. (*Fong v. Westly* (2004) 117 Cal.App.4th 841, 851 [12 Cal.Rptr.3d 76].)

### 2. *Legal Framework*

■ "[T]he distinction between public and private works is due to the principle of sovereign immunity which precludes recordation of mechanic's liens on public works. [Citations.] Subcontractors and material suppliers on public improvement projects . . . have as remedies stop notices [citations] and actions on payment bonds." (*Capitol Steel Fabricators, Inc. v. Mega Construction Co.* (1997) 58 Cal.App.4th 1049, 1060 [68 Cal.Rptr.2d 672].) The remedies are cumulative; a claimant may pursue either. (*Id.* at p. 1061.)

■ A payment bond may be filed with respect to a private work. (Civ. Code, §§ 3235–3237.) However, such bonds are mandatory with respect to public works. (Civ. Code, § 3247.) "Every original contractor to whom is awarded a contract by a public entity . . . involving an expenditure in excess of twenty-five thousand dollars . . . for any public work *shall, before entering upon the performance of the work*, file a payment bond with and approved by the officer or public entity by whom the contract was awarded." (Civ. Code, § 3247, subd. (a); italics added.) An "original contractor" is "any contractor who has a direct contractual relationship with the owner." (Civ. Code, § 3095.) The bond must be "in a sum not less than one hundred percent of the total amount payable by the terms of the contract." (Civ. Code, § 3248, subd. (a).) A "contract" is "an agreement between an owner and any original contractor providing for the work of improvement or any part thereof." (Civ. Code, § 3088.) In other words, every contractor who directly contracts with a

public entity to provide a work of improvement, or part of one, is required to file a payment bond in the amount of the contract price, when that price exceeds $25,000.

■ The public entity is statutorily mandated to require the contractor to provide a bond, when a bond is necessary. (Civ. Code, § 3247.) The public entity also has the duty to determine whether the surety on the bond is an admitted surety insurer, and to investigate the sufficiency of the bond. (*Walt Rankin & Associates, Inc. v. City of Murrieta* (2000) 84 Cal.App.4th 605, 622, 624 [101 Cal.Rptr.2d 48] (*Walt Rankin*).) If the public entity fails in these duties, subcontractors who are unable to recover against the insufficient bond have a cause of action against the public entity. (*Id.* at pp. 627–628.) In *Walt Rankin*, the city required the contractor, "[a]s part of the bid solicitation process and the award of the contract," to provide a payment bond. The contractor provided a payment bond from Red Sea, a foreign lending institution, and a statement from California's Secretary of State acknowledging that Red Sea had filed its annual statement showing its address for service of process. (*Id.* at pp. 610–611.) The city accepted the bond without any further inquiry. When the contractor failed to pay its subcontractor, it was discovered that Red Sea was not licensed as a surety and was not a corporation authorized to do business in California.[5] When the unpaid subcontractor sued the city for failing to perform its statutory duty, the trial court ruled that the city had no duty to investigate the surety on a payment bond. On appeal, the Division Two of the Fourth Appellate District disagreed. Reading Civil Code 3247 in conjunction with the Bond and Undertaking Law (Code Civ. Proc., § 995.010 et seq.), the court concluded that the public entity had a mandatory duty to require that the payment bond be executed by an admitted surety insurer and to exercise reasonable diligence to investigate the sufficiency of the surety. (*Walt Rankin & Associates, Inc. v. City of Murrieta, supra,* 84 Cal.App.4th at pp. 617, 621, 623–624.) "[I]f the City had properly determined that Red Sea was not an admitted surety insurer as it had a duty to do, the City would have been required to reject Red Sea as surety and [the contractor] as well unless and until the latter came up with a payment bond properly provided by an admitted surety insurer or by otherwise sufficient sureties. Therefore, because the City did not comply with its duty to determine whether Red Sea was an admitted surety insurer, its breach of that duty proximately resulted in [the subcontractor's] injuries, i.e., nonpayment of the remainder due under its subcontract." (*Id.* at pp. 627–628.)

■ If a public entity is liable to an unpaid subcontractor for proceeding with a public works contract when it has failed to make certain the contractor provided a payment bond from an admitted surety insurer, it follows that a

---

[5] Indeed, Red Sea's President subsequently pled guilty to fraudulent misrepresentation in connection with his participation in an "Individual Surety Bonding Program."

public entity is equally liable for proceeding with a public works contract when it has failed to make certain the contractor provided a payment bond entirely. In this case, LAUSD proceeded with the Wareforce contract without requiring Wareforce to provide a bond, in violation of Civil Code section 3247 and the duty set forth in *Walt Rankin*. Additionally, LAUSD *paid* Wareforce on the contract, although no bond had been filed, in violation of Civil Code section 3251. It therefore appears clear that LAUSD violated its duties to Wareforce's subcontractors when LAUSD allowed Wareforce to commence work on the project (and paid Wareforce) long before SBC ever obtained the bond on which LAUSD now seeks to rely.

### 3. *Interpretation of a Payment Bond*

■ "In general, a surety bond is interpreted by the same rules as other contracts. [Citation.] That is, we seek to discover the intent of the parties, primarily by examining the words the parties have chosen [citation] giving effect to the ordinary meaning of those words." (*Corby v. Gulf Ins. Co.* (2004) 114 Cal.App.4th 1371, 1375 [8 Cal.Rptr.3d 663].) "The extent of the surety's liability must be gathered from the language used when read in the light of the circumstances attending the transaction." (*Hollenbeck-Bush P. Mill Co. v. Amweg* (1917) 177 Cal. 159, 162 [170 P. 148].) The bond is to be read in the context of the terms of the contract it is guaranteeing, particularly if it incorporates the contract by reference. (*Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271–1272 [8 Cal.Rptr.2d 587].) Additionally, when a bond is given to satisfy a statutory obligation, the relevant statutory provisions are incorporated into the bond. (*Washington Internat. Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 981, 987 [73 Cal.Rptr.2d 282]. Cf. *Meyers v. Block* (1887) 120 U.S. 206, 213 [30 L.Ed. 642, 7 S.Ct. 525] [a bond given in pursuit of a court order is interpreted in light of the order].)

### 4. *Retroactivity of Bonds*

■ A bond issued with "respect to the conduct or fidelity of the principal, or to any other matter usually contemplated as arising in the future, is to be interpreted prospectively, and not retrospectively." (*Meyers v. Block, supra,* 120 U.S. at p. 214.) However, "a surety contract is not retrospective in operation merely because part of the transactions with which the contract is concerned have been consummated earlier when the actual *defaults* insured against are still prospective." (*People v. Great American Ins. Co.* (1963) 222 Cal.App.2d 552, 561 [35 Cal.Rptr. 267].) Thus, the fact that a transaction might have occurred before the bond was issued is of no matter if the bond indicates it was intended to cover that transaction. (*Hollenbeck-Bush P. Mill*

*Co. v. Amweg, supra,* 177 Cal. at p. 165; *Dodd v. Maddox* (1925) 72 Cal.App. 705, 708–709 [238 P. 130].) Similarly, if the law pursuant to which a bond was issued indicates the bond was intended to protect transactions prior to its issuance, the bond will be construed to reach those transactions. (*Corby v. Gulf Ins. Co., supra,* 114 Cal.App.4th at p. 1378.) As long as there was no breach prior to the issuance of the bond, the bond can be interpreted to cover work already begun. (See *Iowa Concrete Breaking Corp. v. Jewat Trucking, Inc.* (Minn.Ct.App. 1989) 444 N.W.2d 865, 867–868.)

 Of course, if a bond is actually intended to reach breaches that have already occurred, it will be so interpreted. "[I]f, from the nature of the case, the subject of guaranty is a past transaction in whole or in part, and the language of the engagement, taken in its natural sense or legal effect, is broad enough to cover it, such language may properly be construed to do so." (*Meyers v. Block, supra,* 120 U.S. at p. 214.)

### 5. *Interpretation of Travelers' Bond*

In October 2001, Travelers issued the bond at issue in this case. The bond was intended to guarantee payment "for all labor and material used or reasonably required for use in the performance of the . . . written agreement dated July 13, 2001 . . . a contract with [LAUSD] for LAUSD II; Fiber LAN project . . . ." We assume, for the purposes of this opinion, that LAUSD is correct in its contention that the July 13, 2001 contract for LAUSD II refers to the contracts for the Packages originally contracted to Wareforce and subsequently assigned to SBC.

There can be no doubt that this bond was intended to cover work performed pursuant to the agreement dated July 13, 2001; the fact that this bond was not issued until October 5, 2001 would not bar recovery for work performed between July 13 and October 5, 2001. However, we must determine whether the bond was intended to cover work which was not only performed prior to the July 13, 2001 date, but for which payments the original contractor (Wareforce) was already in default. We consider the language of the bond, the surrounding contracts, and the applicable law.

There is nothing in the language of the bond which suggests it was intended to have retroactive application. The bond guarantees payment for "all labor and material used or reasonably required for use in the performance of" the "agreement dated July 13, 2001." Work which had been completed in May 2001 is not "used or reasonably required for use" in the performance of a contract which would not come into being for another two months. Had the

bond been intended to apply to work performed for Wareforce, it would have referenced the Wareforce agreement and a year 2000 date. Even if we were to adopt the interpretation that the bond was intended to reach work performed as early as 2000, there is nothing in the bond indicating Travelers was agreeing to guarantee payment for defaults which had already occurred. Indeed, the notice provision of the bond demonstrates the bond was prospective in nature only.

The bond provides that any claimant who did not have a direct contract with SBC[6] must give notice to two of SBC, LAUSD, and Travelers within 90 days of the completion of the claimant's work. But if the bond were interpreted to reach defaults of Wareforce, no subcontractor who had completed work for Wareforce would even *know* of its duty to comply in time to do so, as this bond and its notice provision did not come into existence until more than 90 days had passed from the completion of its work. The notice provision could not be satisfied by claimants for defaults which had already occurred. Therefore, we cannot interpret the bond to have been intended to reach such claimants.[7] In short, it appears from the bond's language that it was not intended to cover defaults on that portion of the work which had already been performed by Wareforce, and was instead intended only to bond that portion to be performed by SBC.[8]

The contract documents executed in July 2001 do not alter this conclusion. SBC accepted an assignment of the contract for the Packages originally contracted to Wareforce. At the same time, SBC *also* agreed to accept Wareforce's receivables and payables with respect to that contract. *But Travelers agreed to bond only the performance of the LAN installation Packages assigned.* Travelers did not agree to bond SBC's performance of the assignment agreement itself or any other agreement SBC may have entered into with Wareforce. Indeed, the assignment agreement was executed July 9, 2001; the bond refers to an agreement dated July 13, 2001. LAUSD goes to great lengths to show that the July 13, 2001 date refers to the

---

[6] This provision was apparently intended to apply to subcontractors who had themselves been hired by subcontractors. However, if the agreement were interpreted to apply retroactively, the plain language of this term would apply to claimants who had worked for Wareforce.

[7] LAUSD notes that, by reason of the stop notices, assignment agreement, and other agreements between Wareforce and SBC, it appears that LAUSD and SBC had notice of EEC's claim within 90 days of EEC's completion of work. This is beside the point. That EEC may have satisfied the notice requirement by happenstance does not undermine the conclusion that the language of the bond itself appears to assume that any claimant's work is to be completed in the future.

[8] At the hearing, the parties each tried to argue the amount of the bond, $12,586,424.29, supported their position. However, as LAUSD introduced no evidence of the contract price, we can conclude nothing from the amount of the bond.

effective date of the assignment of the Wareforce contract. This proves, however, that Travelers agreed to bond only SBC's obligations under the assigned contracts, not any other obligations SBC may have accepted.[9]

■ Moreover, despite LAUSD's suggestion to the contrary, there is nothing in the governing law which mandates a bond issued for a portion of a public works contract must be interpreted to cover all subcontractors who work on any other portion of that contract. While Civil Code section 3247 mandates the filing of a payment bond by any original contractor awarded a "contract" in excess of $25,000, Civil Code section 3088 provides that a contract is an agreement "providing for the work of improvement or any part thereof." The bond is to be issued in the amount of the "contract," not the entire public improvement. (Civ. Code, § 3248.) The legislative scheme clearly envisions contractors agreeing to perform only a portion of a work of public improvement, and they are required to bond only the portion of the work they have contracted to perform.[10]

■ Considering the language of the bond, the circumstances of its execution, and the governing law, we conclude the bond was intended to guarantee payment of subcontractors who performed work for SBC under the assigned agreements.[11] It was not intended to guarantee payment of subcontractors who had worked for, and had contracted to be paid by, Wareforce.

### 6. *LAUSD's Cases Regarding Assignment Are Inapposite*

LAUSD relies on several cases involving the assignment of obligations under public works contracts. In each case, the bond at issue was obtained by the original contractor, and was held to extend to work performed after an

---

[9] LAUSD's own evidence is in agreement. LAUSD employee Sprick declared, "The term, 'LAUSD II' . . . identifies the *scope of work under Wareforce's contract to install [LAN] systems at various [LAUSD] school facilities . . . which contract was assigned to SBC under the Assignment Agreement . . . .* The term 'LAUSD II' is found on [the Travelers' bond] *as a means of describing the scope of work covered by the Labor and Material Payment Bond.*" (Italics added.) In other words, Sprick understood Travelers to be bonding only the LAN installation work which was assigned to SBC, not the assignment agreement itself.

[10] It would be superfluous to require any other result. As the legislation mandates a payment bond for every public works contract in excess of $25,000, there is no reason to extend a bond issued for a public works contract to the entire public improvement.

[11] LAUSD contends it was prohibited from introducing extrinsic evidence as to the intended scope of the bond. Specifically, LAUSD sought to introduce the testimony of its own employees and unidentified "people." The trial court rejected this testimony as self-serving. We agree. At no point did LAUSD proffer the testimony of any employee or agent of SBC or Travelers, the parties who actually executed the bond.

assignment. (*Bricker v. Rollins & Jarecki* (1918) 178 Cal. 347, 351–352 [173 P. 592]; *Hub Hdw. Co. v. Aetna Acc. etc. Co.* (1918) 178 Cal. 264, 267–268 [173 P. 81]; see also *Garvey School Dist. v. Paul* (1920) 50 Cal.App. 75, 78–80 [194 P. 711] [similar result under a performance bond].) In each case, the surety had agreed to bond the payment of all subcontractors providing work on the project. That the subcontractor had provided work on the contract for an assignee was not relevant; the surety's obligation to bond the project was not extinguished by the mere assignment of the contract. This result depends on the assignment of the contract. Had the contract been extinguished, liability would have terminated. There is no liability on a payment bond "unless the work forming the basis for [the] claim was performed by such person . . . pursuant to the contract between the original contractor and the owner." (Civ. Code, § 3267.) "Any work a subcontractor performs after the original contractor's obligations have ended should not extend the surety's liability, since it is the conduct of the original contractor to which the bond relates." (*W.F. Hayward Co. v. Transamerica Ins. Co.* (1993) 16 Cal.App.4th 1101, 1107 [20 Cal.Rptr.2d 468].)

■ These cases are clearly distinguishable. In each case, the surety was liable according to the terms of its prospective bond, and the court simply held that the assignment did not terminate the obligation. This is completely different from holding that a payment bond issued to an assignee on a public works contract will be interpreted to cover defaults of the assignor *prior to the assignment* of the contract and issuance of the bond. We agree that an assignee steps in the shoes of the assignor for the purposes of the continued existence of the assignor's bond. This does not mean, however, that the assignee's bond must reach back and cover all of the existing defaults of the assignor.

### 7. Attorney Fees

■ The trial court concluded EEC may be entitled to its attorney fees in the underlying action under the "tort of another" theory: "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees, and other expenditures thereby suffered or incurred." (*Prentice v. North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645].) When a plaintiff must bring an action against a third party as "the natural and probable consequence" of the defendant's negligence, the attorney fees in that action are recoverable as damages against the defendant. (*Id.*

at p. 621.) Conversely, when the action against the third party is not a natural and probable consequence of the defendant's negligence, the attorney fees are not recoverable. (*Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1156–1157 [230 Cal.Rptr. 276].) When two defendants jointly commit a tort, a plaintiff cannot simply argue that one defendant's conduct caused the plaintiff to pursue an action against the other. "The rule of *Prentice* was not intended to apply to one of several joint tortfeasors in order to justify additional attorney fee damages." (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 57 [6 Cal.Rptr.2d 602].)

LAUSD failed to require Wareforce to provide a payment bond. EEC argues that, had LAUSD guaranteed a bond was in place, EEC would not have pursued the underlying action in order to obtain a partial recovery. We disagree. EEC's underlying action was not a natural and probable consequence of LAUSD's failure to require Wareforce to provide a payment bond. Stop notice and payment bond remedies are cumulative. (*Capitol Steel Fabricators, Inc. v. Mega Construction Co.* (1997) 58 Cal.App.4th 1049, 1061 [68 Cal.Rptr.2d 672].) Likewise, EEC's third party beneficiary suit against SBC was not a consequence of LAUSD's negligence; it was a consequence of SBC's own breach of contract. The underlying action was independent of LAUSD's negligence; EEC, therefore, cannot recover its attorney fees.

EEC argues that it would not have brought the underlying action had a payment bond been in place, as it would have provided an easier, cheaper means of recovery. This may be true. However, EEC was not required to bring the underlying action at all. It could have been made whole *in this action*; there are no damages EEC recovered in the underlying action that it could not also have recovered in this matter directly from LAUSD for its failure to require Wareforce to obtain a bond. EEC's attorney fees were caused by its decision to pursue a joint tortfeasor, rather than simply seek a recovery based on LAUSD's negligence. As a result, EEC may not recover those fees from LAUSD.[12]

---

[12] EEC also argues it should be entitled to some attorney fees due to LAUSD's extreme delay in identifying the bond. As we have concluded that the bond obtained in October 2001 by SBC does not apply, we need not address this issue.

## *DISPOSITION*

The judgment is modified to reduce EEC's damage award by $80,000. As modified, the judgment is affirmed. The parties are to bear their own costs on appeal.

Klein, P. J., and Aldrich, J., concurred.