Filed 12/17/25  Simone v. State Farm Mutual Automobile Ins. Co. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ELIJAH SIMONE, | B326990 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV14579) |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark V. Mooney and Douglas W. Stern, Judges.  Affirmed in part, reversed in part, and remanded with directions.

Gibson, Dunn & Crutcher, Kristin A. Linsley, Sean F. Howell, Bradley J. Hamburger and Eitan Arom for Defendant and Appellant.

Alston & Bird, Brian D. Boone, Matthew P. Hooker, William W. Metcalf and Alexander Akerman for The Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Appellant.

Gutierrez, Preciado & House and Calvin House for Civil Justice Association of California and American Property Casualty Insurance Association as Amici Curiae on behalf of Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Peter H. Klee and Marc J. Feldman for Personal Insurance Federation of California and National Association of Mutual Insurance Companies as Amici Curiae on behalf of Defendant and Appellant.

Shernoff Bidart Echeverria, Ricardo Echeverria, Reid Ehrlich, The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Respondent.

———————————

## INTRODUCTION

Elijah Simone suffered catastrophic injuries when Bruce Jameson hit him with a car while Simone was riding his bicycle home from work. State Farm Mutual Automobile Insurance Company (State Farm) insured Jameson under an automobile policy with a per person liability limit of $25,000. Simone's and State Farm's attempts at settlement were unsuccessful. Simone sued Jameson and obtained a judgment in his favor that exceeded $10 million. After he was assigned Jameson's rights against State Farm, Simone sued State Farm for breach of contract and breach of the implied covenant of good faith and fair dealing based on State Farm's failure to settle within policy limits. The trial court, sitting as the finder of fact, found Simone

made a reasonable settlement offer for policy limits and that State Farm unreasonably rejected it. The court entered a judgment totaling $11,602,322.80 against State Farm, comprised of the underlying award of $10,917,481, plus attorney fees as damages in the amount of $684,841.75. The judgment also provided for accrued interest, stipulated to be $4,345,336 to the beginning of the trial against State Farm and then continuing at a rate of $2,991.09 per day.

State Farm appeals from the judgment, challenging the trial court's liability findings and Simone's entitlement to attorney fees. Simone cross-appeals, contending the court miscalculated the amount of attorney fees as damages and accrued interest to which he was entitled. We reverse the portion of the judgment awarding Simone $684,841.75 in attorney fees as damages and remand for further proceedings. We otherwise affirm the judgment against State Farm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

On April 24, 2015, Simone was riding his bicycle home from work when Jameson hit Simone with his car. Simone suffered spinal injuries that rendered him a partial tetraplegic.[2] Simone spent several months in the hospital and was discharged on or about August 26, 2015.

---

[1]    We derive the factual and procedural background primarily from the parties' "joint stipulation re: uncontroverted facts and issues for trial."

[2]    Simone testified at trial in this case that he regained movement and can walk, but that he suffers from unspecified "residual damage."

A.    *Settlement Attempts*

On June 30, 2015, while Simone was still in the hospital, State Farm sent a letter to Simone stating it was aware he had been injured in an accident with its policy holder, Jameson.  It requested itemized medical bills showing the date of service, diagnostic codes, and treatment codes.  It further requested wage documentation if Simone incurred lost wages.  State Farm indicated it would evaluate the claim for settlement and would consider the following factors: (1) how the accident occurred; (2) the severity of the impact and damages to the vehicles involved; (3) the type and severity of injury to Simone; and (4) reasonable and necessary medical treatment.  State Farm informed Simone that "[r]eimbursement of your expenses will occur upon the settlement of your injury claim at which time we require you to sign a Release that discharges our insured from any future expenses."

On August 26, 2015, State Farm sent another letter to Simone stating it would close its file and assume he did not intend to pursue a claim if it did not hear from him within 30 days.

On August 31, 2015, Simone responded with a letter handwritten by his mother.  She explained Simone did not have the use of his hands, and she was writing on his behalf.  She addressed each of the four factors listed in State Farm's June 30, 2015 letter and attached medical reports on Simone's injuries and treatment.  The letter further stated:

> I have done a lot of research online about car accidents.  I was told to provide you information to the best of my ability "for settlement purposes only."  I've also learned that I ask that you send me everything in writing.  I've answered the

questions that you have asked and these are the things I want and need from you and Mr. Jameson to answer.

1. How much insurance does Mr. Jameson have? I want proof that he has insurance with you. Does he have other insurance? I want a copy of his insurance policy and proof of the amount of insurance he has. I don't have the money to do a search for this information. What kind of car was he driving? Was it a car for work? I need you and him to answer these questions in writing.

2. I want to ask that you offer the maximum amount of money to my son for total amount of insurance Mr. Jameson has.

3. I want you to send my son the check for the maximum amount and only name my son on the check as the money belongs to him. Do not name me on the check either. My son is single and he only should be on the check, not me or his dad.

My son will only settle with you if you answer the questions that we have and agree to what we ask. I need all of the answers in writing and I am giving you 15 days to give me all that I ask. Please do not call me. Please send me everything that I ask for in 15 days. My son is severely injured so you shouldn't need any extra time.

Simone made a mark at the bottom of the letter to indicate his authorization.

Simone testified at trial that he intended "to try to resolve the matter" and "seek closure of the entire thing" by sending the letter. He further testified that he intended to resolve the claim only if he got responses to his questions. He agreed that if he had

5

to satisfy liens as a result of the settlement, he would have done so. Although Simone did not understand what a release was at this time, he stated he understood he would have had to "sign paperwork" to settle the claim and would have done so as well.

At this time, State Farm assessed 75 percent of fault to Simone and 25 percent to Jameson for the accident. Notwithstanding its assessment of fault, State Farm understood Simone's damages claim exceeded Jameson's $25,000 per person policy limit for bodily injury. State Farm assigned Sabrina Morrison to handle the claim. In her case file notes, Morrison described Simone's letter as a "demand for policy limits" and wrote that she was authorized to settle for the $25,000 policy limit.

On September 2, 2015, State Farm notified Jameson regarding Simone's claim and advised him that it "may exceed the amount of coverage available under your policy with State Farm." Jameson told Morrison he did not have any other insurance and was not working at the time of the accident. Morrison also confirmed with the hospital where Simone was treated that it did not have any lien based on his medical bills.

Also on September 2, and after speaking to Jameson, Morrison called Simone and left him a voicemail message extending a settlement offer of $25,000. Although she did not speak with Simone, Morrison sent a letter that same day purporting to "confirm our telephone conversation of September 2, 2015, wherein an offer of $25,000.00 policy limits was extended in settlement of Elijah P. Simone's injury claim." State Farm sent a second letter on September 2 to Simone confirming Jameson had an automobile insurance policy with it and stating the policy limits were "25,000/50,000/25,000." These

6

numbers were not explained in the letter.  At trial, Simone and his mother testified they did not understand what these numbers meant when they received the letter.

Neither of State Farm's September 2, 2015 letters included a copy of Jameson's policy, nor did they answer Simone's questions regarding whether Jameson had any other insurance at the time of the accident, or whether Jameson was driving his vehicle for work.  There is no dispute that State Farm had this information but did not share it with Simone, let alone in writing as his letter requested.  At trial, Morrison and her manager testified they did not answer Simone's questions in writing even though they considered them to be reasonable questions.  Both testified that they preferred to have a telephone conversation with a claimant who was not represented by counsel because it would better allow them to answer any questions and arrive at a settlement.  Morrison's manager testified, "I think our experience typically tells us that a letter is not going to suffice.  It's too complicated.  In a conversation, we can have a back-and-forth."

The parties did not settle Simone's claim before the expiration of the 15-day deadline in his letter, nor did State Farm ask Simone to extend that deadline.

On September 29, 2015, and November 2, 2015, after the 15-day deadline had passed, State Farm sent letters to Simone requesting that he "[p]lease call us at [the] earliest opportunity." The November 2, 2015 letter enclosed a copy of the September 2, 2015 confirmation of coverage letter and repeated State Farm's "policy limits offer of $25,000 for your bodily injury claim in exchange for a full and final release as enclosed."  The release stated Simone "hereby releases and forever discharges Bruce Jameson . . . from any and all claims . . . which have resulted or

7

may in the future develop from an incident on or about the 24 day of April, 2015, at or near Crone St & Euclid Ave Anaheim, CA." State Farm had not previously sent a release. Morrison called Simone again on December 3, 2015. Simone did not return State Farm's calls or otherwise respond to its letters.

B.     *The Lawsuit Against Jameson*

Simone retained counsel and, in January 2016, filed suit against Jameson. Simone alleged Jameson failed to stop and look before turning into an intersection that Simone had already entered while riding his bicycle. State Farm retained counsel to represent Jameson. Jameson died in 2017 while the litigation was ongoing, and his counsel represented Jameson's estate at trial.

On August 3, 2018, the jury found Jameson 75 percent at fault for the accident and Simone 25 percent at fault, which resulted in a $10,942,481.07 verdict in favor of Simone. The court awarded $386,613.49 in costs to Simone and entered judgment in his favor in the total amount of $11,329,094.56. State Farm paid $27,575.30, representing its policy limits plus interest, and $386,613.49 in costs to Simone. This left an excess judgment of $10,917,481 against Jameson's estate.[3] Jameson's estate appealed the judgment but later voluntarily dismissed the appeal.

---

[3]     At the time of his death in 2017, Jameson had not worked since 2013, and his sole source of income was his wife's social security disability. Jameson's wife testified his estate held no assets.

C.     *The Lawsuit Against State Farm*

On April 15, 2020, Simone, as Jameson's assignee, sued State Farm for breach of contract and breach of the implied covenant of good faith and fair dealing under Jameson's policy. The probate court presiding over Jameson's estate had granted Simone's petition to be appointed special administrator for the express purpose of pursuing an insurance bad faith action against State Farm on behalf of the estate.

The matter was tried to the court over three days in August of 2022. The court heard testimony from Simone and his mother, as well as Morrison, her manager, and Jameson's widow. Each side also presented expert testimony concerning proper claims handling by insurance companies. After hearing the evidence and after the parties submitted closing arguments in writing, the trial court issued a tentative statement of decision in favor of Simone, to which the parties submitted their objections. The court requested additional briefing regarding the attorney fees incurred in the action against State Farm.

On October 21, 2022, after considering the parties' objections to the tentative statement of decision, the court (Hon. Mark Mooney) issued its final statement of decision. The trial court found in favor of Simone as the special administrator for Jameson's estate on the claims against State Farm. The court summarized its findings as follows: "Considering all the circumstances, the court finds the defendant's conduct was unreasonable in protecting the interest of its insured. Simone made a reasonable settlement demand for the policy limits available. His request for additional information as a precondition of settlement was reasonable. State Farm had all the information necessary to evaluate the demand and to

9

formulate a response. State Farm was aware of the potential excess exposure to its insured and it could have easily responded to Simone's condition of providing additional information. [¶] Rather than provide Simone with the information requested, defendant allowed the time period to expire. This conduct exposed Jameson to an excess judgment. As a result, the insurer becomes liable for payment of the entire judgment as contract damages under its policy."

The court additionally found Simone was entitled to reasonable attorney fees as damages pursuant to *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (*Brandt*). *Brandt* held, "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss— damages—proximately caused by the tort." (*Id.* at p. 817.)

The trial court determined Simone was entitled to attorney fees and used the lodestar method to award him *Brandt* fees of $684,841.75. It declined to calculate *Brandt* fees based on the 45 percent contingency fee agreement between Simone and his counsel. The court also rejected State Farm's argument that Simone could not recover *Brandt* fees in this action when State Farm had provided a defense to Jameson in the underlying action and paid the policy limit plus interest.

Judge Mooney retired shortly after he issued the final statement of decision in this case. The matter was reassigned to Judge Douglas W. Stern. On October 25, 2022, after Judge Mooney's retirement, the parties submitted objections to the final

10

statement of decision and presented competing proposed judgments for Judge Stern's signature.[4]

Judge Stern adopted State Farm's proposed judgment because it conformed exactly to Judge Mooney's final statement of decision. Judge Stern entered judgment in favor of Simone and against State Farm "for damages in the amount of $10,917,481 representing the unpaid amount of the judgment in the underlying action, plus attorney fees as damages in the amount of $684,841.75 for a total award of $11,602,322.80." The court further finds that "[p]laintiff is entitled to 10% interest, which is stipulated to be $4,345,336 through August 8, 2022, and interest shall continue to accrue at a rate of $2,991.09 per day until the judgment is paid in full."

State Farm timely appealed and Simone timely cross-appealed from the judgment.

---

[4] Four days after Judge Mooney issued the final statement of decision, State Farm filed an "objection to entry of judgment prior to completion of statement of decision process" and a "request for and objections to statement of decision re newly decided *Brandt* fee issue." State Farm argued the issue of *Brandt* fees was not decided in Judge Mooney's tentative statement of decision and thus it was deprived of an opportunity to object to the *Brandt* fees ruling pursuant to California Rules of Court, rule 3.1590. Judge Stern issued a minute order stating Judge Mooney had retired and "[t]herefore no further Decision shall be provided." State Farm does not contend on appeal Judge Stern erred when he issued this order. In all events, we remand for further proceedings on the issue of *Brandt* fees, discussed below, and State Farm will have the opportunity to fully address any objections it may have to a renewed calculation of *Brandt* fees.

11

# DISCUSSION

## A.  *State Farm's Duty To Settle with Simone*

State Farm raises several challenges to the trial court's judgment in favor of Simone.  First, it contends Simone's letter did not constitute a reasonable settlement offer that could form the basis for bad faith liability.  Second, State Farm asserts it acted in good faith as a matter of law because it offered to settle with Simone for Jameson's policy limit.  Third, and in the alternative, State Farm argues there is no substantial evidence that it rejected Simone's settlement offer since the evidence demonstrated it wanted to settle the claim and tried to do so.  Fourth, State Farm contends that if substantial evidence supports the trial court's finding it rejected Simone's policy limits demand, its rejection was the result of an honest mistake, bad judgment, or negligence, not bad faith.[5]

### 1.  *Governing Law*

"From the covenant of good faith and fair dealing implied by law in all contracts, and from the liability insurer's duty to defend and indemnify covered claims, California courts have derived an implied duty on the part of the insurer to accept reasonable settlement demands on such claims within the policy

---

[5]  State Farm raised no causation argument, i.e., that Simone had to demonstrate that he would have accepted the $25,000 policy limit offer to settle his claim against Jameson.  As stated, however, Simone testified that he intended "to try to resolve the matter" and "seek closure of the entire thing" by sending the letter requesting that State Farm "offer the maximum amount of money . . . for total amount of insurance Mr. Jameson has."

12

limits.  [Citation.]  '[A]n insurer is required to act in good faith in dealing with its insured.  Thus, in deciding whether or not to settle a claim, the insurer must take into account the interests of the insured, and when there is a great risk of recovery beyond the policy limits, a good faith consideration of the insured's interests may require the insurer to settle the claim within the policy limits.  An unreasonable refusal to settle may subject the insurer to liability for the entire amount of the judgment rendered against the insured, including any portion in excess of the policy limits."  (*Hamilton v. Maryland Casualty Co.* (2002) 27 Cal.4th 718, 724-725 (*Hamilton*).)

An insurer's "duty to settle arises because of the inherent conflict of interest created by the different risks faced by the insurer and the insured.  If the claim is not settled and instead proceeds to trial and a judgment, the insurer faces only limited liability because the insured is generally responsible for amounts exceeding the policy limits.  [Citation.]  Conduct by the insurer which exposes the insured to this risk, and which may be financially catastrophic for the insured, will not be rewarded." (*Hedayati v. Interinsurance Exchange of the Automobile Club* (2021) 67 Cal.App.5th 833, 844 (*Hedayati*).)

"For bad faith liability to attach to an insurer's failure to pursue settlement discussions, in a case where the insured is exposed to a judgment beyond policy limits, there must be, at a minimum, some evidence either that the injured party has communicated to the insurer an interest in settlement, or some other circumstance demonstrating the insurer knew that settlement within policy limits could feasibly be negotiated." (*Reid v. Mercury Ins. Co.* (2013) 220 Cal.App.4th 262, 272 (*Reid*).) The insurer is not required to initiate settlement negotiations.

13

(*Id.* at p. 272.) "[T]he opportunity to settle is typically shown by proof that the injured party made a reasonable settlement offer within the policy limits and the insurer rejected it." (*Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 525.)

If there is evidence that settlement could feasibly be negotiated, courts look to whether the insurer acted reasonably in responding to settlement overtures. "'[T]he critical issue [is] the reasonableness of the insurer's conduct under the facts of the particular case.' [Citation.] To hold an insurer liable for bad faith in failing to settle a third party claim, the evidence must establish that the failure to settle was unreasonable." (*Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 687 (*Pinto*); accord, *Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 520 (*Barickman*) ["'the ultimate test is whether the insurer's conduct was unreasonable under all of the circumstances'"].) "An insurer that pays the full amount of its policy may be liable for breach of the implied covenant of good faith and fair dealing if improper claims handling causes detriment to the insured." (*Hedayati, supra,* 67 Cal.App.5th at p. 844 [failure to communicate with policyholder]; *Boicourt v. Amex Assurance Co.* (2000) 78 Cal.App.4th 1390, 1392, 1399-1400 (*Boicourt*) [refusal to disclose policy limit prior to litigation]; accord, *Fleming v. Safeco Ins. Co.* (1984) 160 Cal.App.3d 31, 37-38 [unreasonable delay in adjusting claim].)

2.    *Standard of Review*

The parties disagree regarding the applicable standard of review. "'"In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the

14

evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.""'" (*Barickman, supra,* 2 Cal.App.5th at p. 516.)

While the reasonableness of an insurer's conduct is "ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346 (*Chateau Chamberay*) disapproved on other grounds in *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 724, fn. 7; accord, *Hedayati, supra,* 67 Cal.App.5th at p. 843; see also *Reid, supra,* 220 Cal.App.4th at p. 278 [summary judgment].)

State Farm argues the trial court's bad faith findings should be reviewed de novo because the facts surrounding Simone's settlement offer and State Farm's response are undisputed and these facts demonstrate the court made a legal error. If, however, we conclude the court did not make a legal error, State Farm contends we should review for substantial evidence whether it (a) rejected Simone's settlement offer and (b) whether it did so in bad faith, rather than by honest mistake, bad judgment, or negligence. Simone argues we must review the court's factual findings for substantial evidence. Simone asserts

15

the trial court made findings "by weighing the evidence in a contested trial where the parties presented conflicting expert testimony on whether Simone and State Farm had acted reasonably."

Although the settlement communications between the parties are not in dispute, Simone is correct that they are subject to interpretation by a factfinder. (See *Pinto, supra,* 61 Cal.App.5th at p. 689 ["the reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact'"]; *Barickman, supra,* 2 Cal.App.5th at p. 521 ["'the reasonableness of the insurer's claims-handling conduct was a question of fact"].) It is not the case here that "only one reasonable inference can be drawn from the evidence." (*Chateau Chamberay, supra,* 90 Cal.App.4th at p. 346.) The record shows the parties submitted a list of stipulated facts for trial but presented conflicting inferences to be drawn from those facts. Accordingly, to the extent State Farm challenges the trial court's factual findings, we consider whether substantial evidence supports those findings. To the extent State Farm contends the trial court's findings are erroneous as a matter of law, however, we consider those issues de novo. (See *Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601, 610.)

>   3.    *There Was Substantial Evidence Simone Made a Reasonable Settlement Offer*

At the outset, we examine State Farm's argument that Simone needed to present what amounts to a formal settlement offer before its duty to settle arose. Although State Farm responded to Simone's letter offering to settle at policy limits

16

without seeking clarification of any terms, it now argues that Simone's letter itself was not a reasonable settlement offer and was instead "a list of preconditions to a settlement negotiation." State Farm relies heavily on its reading of *Graciano v. Mercury General Corp.* (2014) 231 Cal.App.4th 414, 425 (*Graciano*).

*Graciano* stated the following four factors are necessary for a reasonable offer to settle: "(1) its terms are clear enough to have created an enforceable contract resolving all claims had it been accepted by the insurer [citation], (2) all of the third party claimants have joined in the demand [citation], (3) it provides for a complete release of all insureds [citation], and (4) the time provided for acceptance did not deprive the insurer of an adequate opportunity to investigate and evaluate its insured's exposure." (*Id.* at p. 425.) According to State Farm, Simone's letter failed to create an enforceable contract, provide Jameson with a complete release, or disclose whether any third-party liens existed. But *Graciano* did not actually apply these factors in the case before it, nor were they necessary to its decision (as further explained below). Further, we need not decide whether Simone's letter fulfilled the four factors listed in *Graciano* because the law does not require in all circumstances that these factors be satisfied to maintain a bad faith claim against an insurer.

Indeed, "a formal settlement offer is not an absolute prerequisite to a bad faith action." (*Boicourt, supra,* 78 Cal.App.4th at p. 1399 [plaintiff's inquiry regarding policy limits sufficient where insurer refused to take steps to disclose them].) The existence of an opportunity to settle within the policy limits can be shown by evidence other than a formal settlement offer. (*Id.* at p. 1393.) "[T]here must be, at a minimum, some evidence either that the injured party has

17

communicated to the insurer an interest in settlement, or some other circumstance demonstrating the insurer knew that settlement within policy limits could feasibly be negotiated."[6] (*Reid, supra,* 220 Cal.App.4th at p. 272 [inquiry regarding policy limits insufficient where insurer disclosed limits and there was no subsequent demand letter]; accord, *Planet Bingo, LLC v. Burlington Ins. Co.* (2021) 62 Cal.App.5th 44, 47 (*Planet Bingo*) [subrogation demand letter sufficient]; see also *Merritt v. Reserve Insurance Co.* (1973) 34 Cal.App.3d 858, 879 (*Merritt*) [no bad faith liability attaches where there is no formal settlement offer or other "suggestion that settlement was feasible"].)

Here, Simone's letter demonstrated, at a minimum, that settlement of his claim against Jameson was feasible within policy limits, even absent a formal settlement offer meeting the requirements of *Graciano.* The record before us supports a finding that Simone's letter presented State Farm with his interest in settling his claims against State Farm's insured within policy limits and that State Farm understood it as such. The letter expressed Simone's desire to settle for the "maximum amount" if State Farm "answer[ed] the questions that we have and agree[d] to what we ask." At trial, Simone testified he

---

[6] Although it raised this argument in its opening brief, State Farm contends the trial court did not rely on this reasoning to reach its decision, and the court instead found that Simone made a reasonable settlement demand. This contention suggests we are limited to reviewing the court's reasoning. It is long established that appellate courts ordinarily only look to the trial court's ruling, not at its reasons in support of that ruling. (See *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329-330 (*Davey*); *Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192-1193 (*Young*).)

intended "to try to resolve the matter" and "seek closure of the entire thing" against Jameson if he received answers from State Farm to the questions in his September 2, 2015 letter.

And State Farm recognized the letter was an opportunity to settle. Morrison wrote in her case notes that Simone's letter was a "demand for policy limits" and that she was authorized to settle the matter for the policy limit. State Farm did not ask for clarification of any of the terms in Simone's letter, suggesting it understood Simone's letter as an offer to settle. Further, State Farm's conduct after receiving the letter further confirms it viewed Simone's letter as an opportunity to settle because it made multiple attempts to communicate with Simone about his demand and, as stated, State Farm offered to settle within policy limits.[7]

State Farm relies heavily on *Graciano*'s statement that "[a]n insured's claim for bad faith based on an alleged wrongful refusal to settle first requires proof the third party made a reasonable offer to settle the claims against the insured for an amount within the policy limits." (*Graciano, supra,* 231 Cal.App.4th at p. 425.) But, as stated, there was substantial evidence before the court satisfying this requirement. And to the extent State Farm contends *Graciano* requires a formal offer to settle as a prerequisite to a finding of bad faith, we are not persuaded.

*Graciano* aligns with *Boicourt, Reid, Planet Bingo,* and *Merritt* when it states the rule that, "[w]hen a claim is based on the insurer's bad faith, . . . the ultimate test is whether the

---

[7]    We address below whether State Farm's attempts to communicate with Simone about his demand letter were reasonable.

insurer's conduct was unreasonable under all of the circumstances." (*Graciano, supra*, 231 Cal.App.4th at p. 427.) As outlined above, these circumstances may include a formal settlement offer from the injured party or, absent a formal offer, notice of an opportunity to settle. In *Graciano*, the plaintiff submitted a claim to the defendant insurer after she suffered severe injuries from a traffic accident with the policyholder. In her correspondence with the insurer, she misidentified the policyholder's father, who had a similar name, as the driver and listed the father's insurance policy. The insurer provisionally denied coverage because the policy identified by the plaintiff had lapsed, but it stated its investigation was not complete. Hours before the plaintiff's offer was to expire, the insurer discovered the correct driver and the correct insurance policy and made a settlement offer to plaintiff for the full policy limits. The plaintiff rejected the offer and sued the insurer for bad faith after obtaining an excess judgment against the policyholder and an assignment of rights. A jury found in favor of the plaintiff on the bad faith claim. (See *ibid.*)

The Court of Appeal reversed the judgment, concluding there was no evidence the plaintiff ever offered to settle her claims against the policyholder, rather than his father (who was not the driver and who did not have a valid policy with the insurer). (See *Graciano, supra,* 231 Cal.App.4th at p. 427.) In making that determination, it did not rely on the four factors State Farm cites. Instead, *Graciano* focused on the fact that the insurer instead made a policy limit offer to the plaintiff on behalf of the correct driver and within the time frame plaintiff specified for settlement. The plaintiff rejected that offer. (See *id.* at p. 429.) Under these circumstances, *Graciano* determined there

20

was no substantial evidence to support a finding that the plaintiff's offer was reasonable or that the insurer acted unreasonably.  The court stated, "the undisputed evidence showed [the insurer] did timely tender [its policyholder's] full policy limits in an attempt to settle [the plaintiff's] claim, and therefore acted in good faith as a matter of law 'by offering the policy limits in exchange for a release [thereby doing] all within its power to effect a settlement.'" (*Id.* at p. 435.)

At bottom, and notwithstanding its statement of what constitutes a reasonable settlement offer from a plaintiff, *Graciano* stands for the proposition that an insurer must respond reasonably when an opportunity to settle presents itself (as the insurer in that case did).  In short, "the ultimate test is whether the insurer's conduct was unreasonable under all of the circumstances" given the offer that the plaintiff presented to the insurer. (*Graciano, supra*, 231 Cal.App.4th at p. 427.)  The circumstances in *Graciano* were that the insurer understood settlement was feasible even when it received the plaintiff's settlement demand that identified the wrong insured.  Rather than ignoring plaintiff's demand or rejecting it outright, the insurer indicated its investigation was not complete and then did "'all within its power to effect a settlement.'" (*Graciano, supra,* 231 Cal.App.4th at p. 435.)  In this light, *Graciano* does not impose a categorical requirement that a formal settlement offer is necessary for bad faith liability to attach.  "[T]he language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1097; see *McGee v. Superior Court* (1985) 176 Cal.App.3d 221, 226 ["The holding of a decision is limited by

21

the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning."]; *Ace American Ins. Co. v. Fireman's Fund Ins. Co.* (2016) 2 Cal.App.5th 159, 175 [same].).

4.    *Substantial Evidence Supports the Trial Court's Factual Finding that State Farm Did Not Act Reasonably Under the Circumstances When Responding to Simone's Letter*

We now consider the "critical issue" of whether the evidence before the trial court demonstrated that State Farm acted reasonably in its response to Simone's letter.  (*Pinto, supra,* 61 Cal.App.5th at p. 687.)  State Farm's principal argument is that it acted in good faith as a matter of law because it offered Simone a settlement for full policy limits within the time period specified in his letter.  The law does not support State Farm's argument.  Whether State Farm's conduct was reasonable presented a quintessentially factual question for the factfinder to decide.  Here, the trial court found as a factual matter that State Farm did not act reasonably under the circumstances, and we conclude substantial evidence supports its finding.

a.    There was substantial evidence that State Farm did not act reasonably in response to Simone's letter

It is undisputed State Farm had all the necessary information to respond to Simone's questions but that State Farm nevertheless chose not to communicate that information to Simone (let alone in writing) to secure a settlement of Simone's claims against Jameson.  Morrison spoke with Jameson on

22

September 2, 2015, and confirmed he had no other insurance and was not driving in the course of employment. Yet, the two September 2, 2015 letters from State Farm did not comply with Simone's request in his letter to include a copy of Jameson's policy, nor did they state whether Jameson had any other insurance at the time of the accident, or whether Jameson was driving the vehicle for work at the time of the accident. Nor is there any evidence in the record that Morrison conveyed this information to Simone in her voicemail to him on that day or afterwards. Simone's August 31 letter explained he "will only settle with you if you answer the questions that we have." Simone testified at trial that had he received the information requested from State Farm, he would have "considered the matter settled." It is a reasonable inference from this evidence that had State Farm answered Simone's questions, Simone stood ready to accept a $25,000 policy limits settlement offer and that State Farm's insured would not have been exposed to the multimillion dollar jury verdict in the underlying trial after the matter did not settle.

At trial, State Farm's witnesses agreed Simone's questions were reasonable. But they testified they decided they would not respond to Simone in writing, as he requested, because it was their preference to communicate with unrepresented claimants by telephone. Further, while it made a policy limit offer of $25,000 in one letter, State Farm did not explain what it meant when it stated in a separate letter the policy limits were "25,000/50,0000/25,000," which Simone testified he did not understand.

The evidence before the trial court was that State Farm allowed Simone's 15-day deadline to expire without meeting his

reasonable requests in writing, even though it had obtained the information he requested.[8]  Yet, it argues that Simone should have provided a release of his claims against Jameson without necessary information that Simone had requested, including whether Jameson had additional insurance and whether he was driving in the course of employment.  Again, it is undisputed that Simone's requests were reasonable, particularly because State Farm told him it would require a release of his claims against Jameson before it would pay any of Simone's expenses.  As the trial court found, "there could be no settlement in this case until

---

[8]　Relying on recent legislation that does not apply to this case, State Farm contends "the information Simone sought to confirm did not constitute a material term of a settlement" and therefore State Farm's failure to address Simone's conditions did not mean it unreasonably rejected his settlement overture.  Code of Civil Procedure section 999.1 became effective in 2023, and it lists the requirements for a "clear and unequivocal offer to settle all claims within policy limits, including the satisfaction of all liens."  (Code Civ. Proc., § 999.1, subd. (b).)  State Farm concedes this legislation is inapplicable to Simone's letter because the statute does not apply to demands transmitted before January 1, 2023, or to demands from unrepresented claimants.  (See Code Civ. Proc., §§ 999.4, subd. (b), 999.5, subd. (c).)  In all events, Simone clearly expressed in the letter written by his mother on his behalf that the information was material to him and he would not settle without it:  "My son will only settle with you if you answer the questions that we have and agree to what we ask.  I need all of the answers in writing and I am giving you 15 days to give me all that I ask."  As discussed above, the trial court was entitled to determine whether State Farm's failure to fulfill these terms was reasonable and our review is limited to whether substantial evidence supports this finding.

State Farm confirmed the policy limits and that there was no other coverage, or potential parties. There was no reason for further discussion of a release or resolution of liens until Simone's express conditions had been met." Substantial evidence supported the trial court's factual finding that State Farm acted unreasonably by failing to settle with Simone for Jameson's policy limits, exposing Jameson to an excess judgment.

State Farm also argues there is no substantial evidence that it rejected Simone's offer or, alternatively, that its rejection was a result of an "honest mistake, bad judgment or negligence." The substantial evidence supporting the trial court's finding that State Farm acted unreasonably in adjusting Simone's claim also supports a finding that State Farm rejected the offer and that its rejection was not the result of an honest mistake, bad judgment, or negligence. In short, State Farm had the information Simone requested but chose not to communicate it to him by the deadline in his letter, opting instead to attempt to contact him by telephone despite the request in his letter that all communications be in writing. In all events, the trial court was entitled to make a factual finding that State Farm's conduct was sufficiently unreasonable under the circumstances to breach the duty of good faith and fair dealing, rather than merely being an honest mistake, poor judgment or negligence. (See *Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582 ["When a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings."].)

25

          b.      A policy limits offer alone does not demonstrate good faith as a matter of law when there is evidence of unreasonable claims handling

Again citing *Graciano*, State Farm argues it acted in good faith as a matter of law because it offered the $25,000 policy limit within two days of Simone's letter. State Farm's argument overlooks the basic tenet that "the ultimate test [of bad faith] is whether the insurer's conduct was unreasonable under all of the circumstances." (*Graciano, supra*, 231 Cal.App.4th at p. 427; accord, *Pinto, supra,* 61 Cal.App.5th at p. 687 ["In evaluating whether an insurer acted in bad faith, 'the critical issue [is] the reasonableness of the insurer's conduct under the facts of the particular case.'"]; *Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1237 ["[i]f an insurer is to avoid liability for bad faith, its actions and positions with respect to the claim of an insured, and the delay or denial of policy benefits, must be 'founded on a basis that is *reasonable under all the circumstances*'"].)

In *Graciano,* there were no circumstances either before or after the demand that supported a finding the insurer acted unreasonably. When the *Graciano* insurer was presented with a demand letter that misidentified the driver and the policy number, it conducted its own search to discover the correct driver and the correct policy. It then made a timely policy limit offer to the claimant. *Graciano* determined the insurer acted in good faith as a matter of law under "all of the circumstances" presented. (*Graciano, supra,* 231 Cal.App.4th at p. 435.) As stated, unlike the insurer in *Graciano*, here, State Farm did not do "'all within its power to effect a settlement'" (*ibid.*) based on its withholding of information Simone requested in writing.

26

Further, California courts have consistently held that unreasonable claims handling, despite a timely policy limit offer, may support a finding of bad faith.  That is, a policy limit offer alone is not enough to overcome other circumstances demonstrating a breach of the implied covenant of good faith and fair dealing.  *Hedayati, supra,* 67 Cal.App.5th at page 850 is instructive.  There, the insurer made a policy limits settlement offer but initially refused to disclose the insured's policy limits, later declined to provide written proof of those limits, withheld the insured's statement that he had no other assets, and refused to provide a copy of the policy despite requests for this information from the claimant's attorney.  (*Id.* at p. 837.)  After the insurer failed to settle with the claimant for the $25,000 policy limit, the claimant obtained a $26 million judgment against the insured, along with an assignment of the insured's claim against the insurer for breach of the implied covenant of good faith and fair dealing.  The trial court granted summary judgment in favor of the insurer, concluding the insurer did not act in bad faith as a matter of law because it made an offer to settle for the policy limit.  (*Ibid.*)

The Court of Appeal in *Hedayati* reversed.  It held, "we cannot say as a matter of law that this [policy limits offer] fulfilled [the insurer's] good faith obligations to its insured. . . . A reasonable trier of fact could conclude the [insurer's] October 31 letter [tendering a policy limit offer] at best was an invitation to continue negotiating a settlement.  This is particularly true since that letter omitted essential documentation [the claimant's] lawyer required before agreeing to any settlement." (*Hedayati, supra,* 67 Cal.App.5th at p. 850.)

Likewise, in *Barickman, supra*, 2 Cal.App.5th at page 518, this Division held that an "offering of the policy limits was not sufficient in and of itself to defeat a bad faith claim as a matter of law." In *Barickman,* the insurer made a timely settlement offer of the policy limits to the claimants, which they accepted. The claimants signed the releases sent by the insurer but added an explanatory sentence regarding court-ordered restitution. The insured had been convicted in criminal court and the court had ordered her to pay $165,000 in restitution. By law, a civil settlement and release do not discharge a defendant's responsibility to satisfy a restitution order. (See Pen. Code, § 1202.4; see also *People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1133.) Despite this, the insurer refused to modify the release to comply with the statutory requirements. (*Barickman,* at p. 518.)

*Barickman* held the insurer's refusal to modify the release was sufficient for bad faith liability notwithstanding its policy limit offer. (*Barickman, supra,* 2 Cal.App.5th at p. 520.) In reaching its conclusion, *Barickman* rejected the insurer's reliance on *Graciano*'s statement that a timely offer for policy limits constituted good faith as a matter of law. (*Ibid*.) *Barickman* reasoned that *Graciano* stands for the "fundamental principle" that "'[w]hen a claim is based on the insurer's bad faith, . . . the ultimate test is whether the insurer's conduct was unreasonable under all of the circumstances.'" (*Ibid.*, quoting *Graciano, supra,* 231 Cal.App.4th at p. 427.) "In *Graciano* there were no other circumstances that raised a question of the insurer's good faith either before or after it tendered the full policy limits." (*Barickman,* at p. 520.) In *Barickman,* by contrast, the insurer initially acted in good faith by offering the policy limits but there were disputed facts whether its subsequent claims handling

28

constituted good or bad faith.  This was a question of fact to be resolved following a trial.  (*Ibid.*)

*Hedayati* and *Barickman* were both summary judgment cases, but the same principle applies here.  That is because in this case, it was a question of fact—which the trial court resolved—whether State Farm's policy limits offer to Simone fulfilled its duty of good faith and fair dealing to Jameson in light of its failure to provide the additional information Simone reasonably requested.  Like the *Hedayati* plaintiff, Simone told State Farm that he required certain information in order to reach a settlement against Jameson.  State Farm's response was to tender a policy limit offer that did not include this information essential to Simone.  Under *Hedayati* and *Barickman,* we cannot say that State Farm's response demonstrates good faith conduct as a matter of law under the circumstances presented.  As stated, this was a factual question for the factfinder to decide based on the evidence at trial.

State Farm relies on *Graciano, supra*, 231 Cal.App.4th at page 435*, Boicourt, supra*, 78 Cal.App.4th at pages 1393 to 1399*, Pinto, supra,* 61 Cal.App.5th at page 681*, Strauss v. Farmers Ins. Exchange* (1994) 26 Cal.App.4th 1017 (*Strauss*), and *Lehto v. Allstate Ins. Co.* (1994) 31 Cal.App.4th 60 (*Lehto*) to argue, "the insurer *has* satisfied its duty to seek to settle in protection of its insured when, 'in the light of the time limitation which plaintiff had placed on her offer' [citation], the insurer tenders its full policy limits *within* the time limits imposed by an injured party's demand letter."  (*Graciano,* at p. 435.)  But none of these cases holds that a policy limits offer alone overcomes unreasonable claims handling by the insurer.

29

In *Boicourt,* the court held that an insurer's blanket refusal to disclose its policy limits before litigation could form the basis for a bad faith claim despite its post-litigation offer to settle for policy limits. (*Boicourt, supra*, 78 Cal.App.4th at pp. 1393-1399.) *Boicourt* explained, "[A] liability insurer "'is playing with fire"' when it refuses to disclose policy limits. Such a refusal "'cuts off the possibility of receiving an offer within the policy limits"' by the company's "'refusal to open the door to reasonable negotiations.'""" (*Id.* at p. 1392.)

*Graciano, Strauss, Lehto,* and *Pinto* also do not hold that a policy limits offer alone constitutes good faith regardless of any other circumstances. As stated, the core inquiry in insurance bad faith cases is whether the insurer acted reasonably under the circumstances. Accordingly, in each of these cases, the courts examined whether the insurers acted reasonably in adjusting a claim in addition to addressing whether the insurer made or accepted a policy limits offer. In *Graciano, supra*, 231 Cal.App.4th at page 435, the insurer acted reasonably as a matter of law because it proactively searched for and found the correct driver and policy and then made a timely offer for policy limits. Both *Strauss, supra,* 26 Cal.App.4th at page 1021 and *Lehto, supra,* 31 Cal.App.4th at page 73 held that bad faith liability could not be predicated on the insurer's rejection of a policy limits demand that released one of its insureds but not the others. *Strauss* and *Lehto* determined the insurer acted in good faith by protecting all its insureds even though it could have settled for the policy limits as to one. (See *Strauss,* at p. 1021; *Lehto,* at p. 73.) Indeed, we have previously rejected an insurer's argument that "regardless of any other circumstances, a timely policy limits settlement offer insulates an insurer from a claim of

30

bad faith." (*Barickman, supra,* 2 Cal.App.5th at p. 520, fn. 5 [addressing *Lehto*].)

*Pinto, supra,* 61 Cal.App.5th at page 681 parallels *Graciano.* There, the insured allowed a friend to drive her truck. The friend drove the truck off the road, it flipped, and everyone in the truck was injured. The claimant became a quadriplegic as a result of the accident. His attorney demanded, among other things, that the insurer provide a declaration from the driver that she was not acting within the course and scope of her employment at the time of the accident. The insurer made considerable efforts to locate and communicate with the driver, but she refused to cooperate. The insurer offered to settle with the claimant for the full policy limits and provided every other piece of information or documentation requested, except for the declaration from the driver. (See *id.* at p. 685.) The claimant rejected the settlement offer. *Pinto* concluded there was no evidence the insurer caused the settlement to fail. Instead, the jury expressly found the insurer made reasonable efforts to obtain the cooperation of the driver. Her lack of cooperation (rather than anything the insurer did) derailed the settlement. (See *id.* at p. 693.) Under these circumstances, the insurer "did all it could to achieve a settlement." (*Ibid.*) Given these authorities, it is evident that an offer to settle for policy limits alone does not demonstrate good faith as a matter of law, irrespective of evidence before the trier of fact of unreasonable claims handling by the insurer.[9]

---

[9] Three amicus curiae briefs in support of State Farm were filed in this appeal. The briefs highlight the abuses that may arise from what are known as "set-up" offers in which a plaintiff's

31

B.     Brandt *Fees*

Simone's cross-appeal challenges the amount of *Brandt* fees and accrued interest awarded in the judgment.  Simone contends the trial court failed to use the correct method to determine the *Brandt* fees award and abused its discretion when it held Simone to a mistaken stipulation as to the amount of interest accrued from the underlying judgment against Jameson.  In this section, we also consider State Farm's contention that Simone may not recover *Brandt* fees because this action seeks recovery beyond the policy limits.

1.     *Governing Law*

"California follows what is commonly referred to as the American rule, which provides that each party to a lawsuit must ordinarily pay his own attorney fees."  (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.)  The American rule is codified in Code of Civil Procedure section 1021:  "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided."  The California Supreme Court created an exception to the American rule in insurance bad faith cases that is now "well

---

offer to settle contains "hyper-technical and often unrealistic conditions."  In amici curiae's view, in that scenario, the insurer becomes vulnerable to a bad faith claim for damages greatly exceeding the policy limits when it is unable to timely comply with or agree to the conditions of the claimant's offer.  That scenario is not presently before us because State Farm's witnesses testified Simone's questions were reasonable.

settled." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 806 (*Cassim*).)

In *Brandt*, the California Supreme Court "explained that if an insurer fails to act fairly and in good faith when discharging its responsibilities concerning an insurance contract, such breach may result in tort liability for proximately caused damages. Those damages can include the insured's cost to hire an attorney to vindicate the insured's legal rights under the insurance policy. 'When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss— damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action.'" (*Cassim, supra,* 33 Cal.4th at p. 806, quoting *Brandt, supra*, 37 Cal.3d at p. 817.)

"In sum, 'the theory of *Brandt* (and the cases on which it relies) . . . [is] that a plaintiff is entitled to be made whole for the harm he suffered by reason of the defendant's *tortious conduct* in denying benefits due under the insurance policy.'" (*Cassim, supra*, 33 Cal.4th at p. 815.) "*Brandt* was not intended to make the plaintiff whole for the cost of retaining an attorney to recover tort or punitive damages. Rather, *Brandt* fees allow the plaintiff to recover the policy benefits in full, undiminished by the 'attorney's fees incurred in connection with the contract cause of action.'" (*Id.* at p. 815.)

The high court has explained that an insurer's breach of the implied covenant of good faith and fair dealing "'sounds in both contract and tort.'" (*Johansen v. California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 18 (*Johansen*), quoting *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425, 432 (*Crisci*).) "But the scope of the duty imposed upon the insurer by the implied covenant of good faith and fair dealing does not turn on whether its breach is characterized as contractual or tortious because, in either case, the duty itself springs from the contractual relationship between the parties. [Citation.] Put another way, an insurer's breach of the implied covenant of good faith and fair dealing constitutes what is commonly called 'bad faith.' Whether the insured's remedy will be in contract or tort will depend on the nature of the relief or recovery sought by the insured." (*Archdale v. American Internat. Specialty Lines Ins. Co.* (2007) 154 Cal.App.4th 449, 466 (*Archdale*).) "If the insured elects to proceed in tort, recovery is possible for not only all unpaid policy benefits and other contract damages, but also extra-contractual damages such as those for emotional distress, punitive damages and attorney fees." (*Id.* at pp. 467-468, fn. 19.) Insureds may recover *Brandt* fees if they elect to proceed in tort on their bad faith claim. (See *Archdale,* at p. 467.)

In *Cassim, supra,* 33 Cal.4th at pages 811 to 812, the Supreme Court set out the proper method for calculating *Brandt* fees where the insured retained counsel under a contingent fee arrangement to bring a bad faith action against the insurer. We more fully address the methodology set out in *Cassim* below. In *Essex Ins. Co. v. Five Star Dye House, Inc.* (2006) 38 Cal.4th 1252, 1255 (*Essex*), the high court extended the recovery of *Brandt* fees to third party assignees such as Simone.

34

## 2. *Standard of Review*

"[A]s in any tort case, the plaintiff bears the burden of proving by a preponderance of the evidence both the existence and the amount of damages proximately caused by the defendant's tortious acts or omissions." (*Cassim, supra*, 33 Cal.4th at p. 813.) A trial court's ruling on *Brandt* fees is reviewed for abuse of discretion. (*Id.* at p. 805.) Under this standard, "we have no authority to substitute our own decision for that of the trial court," and "[o]ur inquiry is limited to determining whether the trial court's decision exceeds the bounds of reason." (*American Federation of State, County & Municipal Employees v. Metropolitan Water Dist*. (2005) 126 Cal.App.4th 247, 269.)

## 3. *Additional Proceedings*

In his trial briefing, Simone argued he was entitled to an award of *Brandt* fees based on the 45 percent contingency fee arrangement approved by the probate court. Simone requested the full amount of his contingency fee—$6,868,267.65—as *Brandt* fees. After considering the parties' briefs, the trial court issued its tentative statement of decision. The trial court rejected Simone's request for fees based solely on the amount of the contingency fee because this was "not the appropriate method for determining the actual fees incurred in establishing the estate's rights to the contract benefits." The trial court requested Simone's counsel submit evidence of the hours they worked and their hourly market rates. It also allowed State Farm to submit objections or opposing evidence on the issue.

As requested, Simone's counsel submitted declarations in support of their request for *Brandt* fees. Each counsel set out the

35

number of hours he or she worked on specific items, such as the trial briefs, discovery, and probate court proceedings. Counsel estimated they spent a total of 1,233 hours during the course of their years-long representation of Simone. Simone's counsel also set out the hourly market rate for each attorney. Under this calculation, Simone requested a total of $1,137,200 in attorney fees. Simone additionally argued a lodestar multiplier of two to four times was warranted due to the contingent nature of the work, the novelty and difficulty of the issues involved, the skill of the attorneys, and the preclusion of other work.

State Farm submitted a declaration from its own counsel, Andre E. Jardini, as an expert on *Brandt* fees. Jardini opined Simone was required to, but did not, distinguish between the attorney fees incurred for "recovery of contractual benefits and recovery of extra contractual damages." Jardini rejected Simone's assertion that his attorneys' activities were entirely recoverable under *Brandt* and did not need to be allocated. Jardini estimated an allocation between 25 to 50 percent of the total hours for pursuit of contractual benefits. Jardini further opined the hourly rates requested by plaintiff's counsel were too high and that the use of a lodestar multiplier for *Brandt* fees was incorrect.

On October 21, 2022, the court issued its final statement of decision after consideration of the parties' additional briefing. It used the lodestar method to award Simone $684,841 in *Brandt* fees. It declined to enhance that total by a lodestar multiplier. In making its calculation, the court determined the time spent in the probate court seeking an assignment of rights from Jameson's estate was not recoverable under *Brandt*. It thus discounted the 1,233 total hours of work by 98 hours, leaving 1,135 hours. It

36

also discounted by 35 percent the hourly rates sought by Simone's counsel.[10]

State Farm submitted its objections to the final statement of decision on October 26, 2022. Judge Stern, noting that Judge Mooney had retired, declined to change the final statement of decision.

### 4. *Simone May Recover* Brandt *Fees*

In its appeal, State Farm argues Simone (as the authorized representative of Jameson's estate) is not entitled to *Brandt* fees because State Farm paid the policy limit of $25,000 plus interest in the underlying personal injury action between Simone and Jameson, such that Jameson's estate has received all the benefits due under his policy. State Farm contends *Brandt* holds that "[a]n insurance claimant can recoup only those attorneys' fees spent to obtain "the benefits due under [the] policy," rather than fees "attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy." (*Brandt, supra,* 37 Cal.3d at pp. 817, 819.)

It is well settled that policy benefits owed to an insured by an insurer extend beyond the obligation to pay the policy limits on a claim. An insurer, for example, also has the obligation to adjust the claim in good faith, reasonably settle a claim when the opportunity arises, and defend its insured. (See *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 (*Comunale*);

---

[10] The court reduced the hourly rate requested by Simone's most senior counsel from $1,400 to $900. The other attorneys' rates were reduced from $895 to $581.75 and from $500 to $325. The court did not reduce the $175 rate requested for non-attorney time.

accord, *Crisci, supra,* 66 Cal.2d at p. 430; *Hamilton, supra,* 27 Cal.4th at pp. 724-725; *Hedayati, supra,* 67 Cal.App.5th at p. 850; *Barickman, supra*, 2 Cal.App.5th at p. 517.)

In *Comunale, supra,* 50 Cal.2d at page 654, the California Supreme Court explained, "The policy limits restrict only the amount the insurer may have to pay in the performance of the contract as compensation to a third person for personal injuries caused by the insured; they do not restrict the damages recoverable by the insured for a breach of contract by the insurer." (*Id.* at p. 659.) "If [the insurer] had performed its contract, it would have settled the action against [the insured], thereby protecting him from all liability. The allowance of a recovery in excess of the policy limits will not give the insured any additional advantage but merely place[s] him in the same position as if the contract had been performed." (*Id.* at p. 661.) Thus, the "amount due under the policy" may exceed the policy limits.

Addressing substantially similar facts to this case, *Archdale, supra,* 154 Cal.App.4th at page 456 explained that: "(1) where a liability insurer has provided a defense and, prior to the filing of an action by an insured (or assignee), has fully paid out the amount of its policy limit, it may not be liable for the breach of any express policy provision promising such benefits, but nonetheless could be held liable for a breach of the implied covenant of good faith and fair dealing; (2) an insurer's failure to accept a reasonable settlement offer to resolve a third party claim against its insured constitutes a breach of the covenant of good faith and fair dealing implied in a liability policy; (3) such a breach, if it results in an excess judgment against the insured, will support a claim sounding in contract as well as tort; (4) the

38

amount of the excess judgment is a consequential damage of such a breach within the meaning of Civil Code section 3300 and may be recovered as a matter of contract damages." *Archdale* further explained the insured or the assignee was entitled to recover *Brandt* fees incurred in pursuing a claim for the breach of the implied covenant of good faith and fair dealing since the breach sounds in tort and in contract. (See *id.* at p. 467.)

Here, the policy benefit owed to Jameson but not fulfilled by State Farm was the duty to settle within policy limits arising from the risk of Simone obtaining an excess judgment against Jameson. This risk was realized when Simone received such a judgment in an amount that was $10 million more than the policy limit. Simone, stepping into the shoes of Jameson, was entitled to recover the policy benefit, calculated at $10 million, that Jameson was denied by State Farm's breach. (See *Comunale, supra*, 50 Cal.2d at p. 659; *Archdale, supra,* 154 Cal.App.4th at p. 456.) In other words, if State Farm had performed its obligations under the insurance contract, Jameson's estate would not be liable for the $10 million judgment entered in Simone's favor. Accordingly, under *Brandt,* Simone may recover the attorney fees he incurred in connection with his pursuit of contract damages arising from State Farm's breach of the implied covenant of good faith and fair dealing it owed Jameson. (See *Brandt, supra,* 37 Cal.3d at p. 817; *Archdale, supra,* 154 Cal.App.4th at p. 467.)

State Farm relies on its reading of one paragraph in *Essex* to argue the policy benefits an insured may obtain under *Brandt* are capped by the policy limits. In *Essex, supra,* 38 Cal.4th at page 1258, the California Supreme Court stated: "In a tort action for wrongful denial of policy benefits, *Brandt* allows the insured

39

to recover as tort damages only the attorney fees incurred to obtain the policy benefits wrongfully denied. (*Brandt, supra*, 37 Cal.3d at p. 819.) But **attorney fees expended to obtain damages exceeding the policy limit** or to recover other types of damages **are not recoverable as *Brandt* fees.** (*Ibid.*; see *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 811-812 [attorney fees to obtain emotional distress damages and punitive damages not recoverable under *Brandt*].) This follows from the rationale of *Brandt*: The tort of bad faith against the insured entitles the insured to recover the policy benefits in *full*, undiminished by attorney fees, but not to recover attorney fees in general. **Allowing recovery of attorney fees incurred to obtain damages beyond the policy limit or to obtain punitive damages would** allow the insured to recover attorney fees as attorney fees, **violating the American rule**, embodied in Code of Civil Procedure section 1021, that parties generally must pay their own attorney fees. 'Rather, *Brandt* merely entitles the insured to all of the benefits due under the policy, undiminished by the expenses incurred in retaining an attorney to recover under the policy.' (*Cassim v. Allstate Ins. Co., supra*, at p. 815 (conc. & dis. opn. of Baxter, J.).)" (*Essex,* at p. 1258, emphasis added.)

State Farm extracts the phrases in bold to argue that *Essex* holds "the benefits due under the policy" discussed in *Brandt* are limited to or defined by the policy limits.

Contrary to State Farm's argument, *Essex* did not so hold. Taken in context, it appears *Essex* used the term "policy limits" as a shorthand for contractual damages. Thus, this passage means that *Brandt* fees may not be recovered for attorneys' efforts to obtain extra-contractual damages ("damages beyond the

40

policy limit") or punitive damages. This reading comports with *Brandt* and *Cassim,* the cases on which *Essex* relies for this purported statement, and neither of which equates policy benefits with policy limits. Indeed, the California Supreme Court explained that a policy limit is "the amount the insurer may have to pay in the performance of the contract as compensation to a third person for personal injuries caused by the insured." (*Comunale, supra,* 50 Cal.2d at p. 659.) As stated, policy benefits, on the other hand, extend beyond what the insurer may have to pay to a third party claimant; *Essex, Brandt,* and *Cassim* demonstrate the various duties owed by insurers. (See *Essex, supra,* 38 Cal.4th at p. 1263 [duty to defend]; *Brandt, supra,* 37 Cal.3d at p. 816 [improper denial of disability benefits]; *Cassim, supra,* 33 Cal.4th at p. 787 [improper claims handling].)

In all events, *Essex* stated the issue before it was: "When an insured assigns a claim for bad faith against the insurer, and the assignee brings a tort action against the insurer that includes a claim for wrongfully withheld policy benefits, may the assignee recover *Brandt* fees?" (*Essex, supra,* 38 Cal.4th at p. 1255.) *Essex* did not purport to resolve any other issue, much less whether *Brandt* fees may be recovered by an assignee for damages exceeding the policy limit. *Essex* did not address policy limits at all; the duty owed to the insured in that case was the "contract obligation under the policy to defend its insured." (*Id.* at p. 1263.) It is axiomatic that cases are not authority for propositions not considered. (See *State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 614.)

41

5.     *The Trial Court Improperly Calculated the Amount of*
       Brandt *Fees Simone Was Entitled To Recover*

In his cross-appeal, Simone argues the trial court improperly used the lodestar method to calculate *Brandt* fees. Simone asserts *Cassim, supra,* 33 Cal.4th at page 787 governs the calculation of *Brandt* fees in cases involving contingency fees. By Simone's calculation, he should be awarded *Brandt* fees of $6,830,138.62. State Farm argues that if we determine Simone is entitled to *Brandt* fees, the trial court properly used the lodestar method to award $684,841.75 in fees. We agree with Simone that *Cassim* establishes the appropriate method to calculate *Brandt* fees and that we and the trial court are bound by it. We, however, conclude the amount of fees should be determined in the first instance by the trial court using the *Cassim* method. We therefore remand to the trial court for that determination.

In a case such as this one in which the insured's assignee retains counsel on a contingency basis to assert claims for breach of contract and breach of the implied covenant of good faith and fair dealing, *Cassim* provides the proper method for calculating *Brandt* fees. (See *Cassim, supra,* 33 Cal.4th at pp. 811-812.) "This method requires the trier of fact to determine the percentage of the legal fees paid to the attorney that reflects the work attributable to obtaining the contract recovery. . . . [¶] To determine the percentage of the legal fees attributable to the contract recovery, the trial court should determine the total number of hours an attorney spent on the case and then determine how many hours were spent working exclusively on the contract recovery. Hours spent working on issues jointly related to both the tort and contract should be apportioned, with some hours assigned to the contract and some to the tort. This

42

latter figure, added to the hours spent on the contract alone, when divided by the total number of hours worked, should provide the appropriate percentage." (*Ibid.*)

*Cassim* provided an example of this calculation: "Suppose the compensatory damages are $3,594,000. Suppose further that the attorney and the client have a 40 percent contingent fee agreement. The total legal fee for the compensatory award is thus 40 percent of $3,594,000, or $1,437,600. Now suppose counsel spent 1,500 hours on the case, and can prove this breakdown: 200 hours on issues related solely to the contract, 500 hours on issues relevant to both the contract and the tort, and 800 hours on issues related solely to the tort. The trial court could reasonably conclude that half the hours spent on the joint contract/tort issues are fairly attributable to the contract (i.e., half of 500 hours, or 250 hours), and thus 30 percent of the hours worked (200 hours plus 250 hours, divided by 1,500 total hours) is attributable to the contract recovery. Thirty percent of the total legal fee (30 percent times $1,437,600) is $431,280. This is the amount a trial court should award as *Brandt* fees in this hypothetical situation." (*Cassim, supra,* 33 Cal.4th at p. 812.)

Here, the trial court was required to but did not follow *Cassim* to calculate an award of *Brandt* fees.[11] (See *Auto Equity*

_____

[11] We need not consider whether *Cassim* left room for an alternate method of calculation because, even if it did, the lodestar method used by the trial court was not an appropriate alternative. *Brandt* explained, "The attorney's fees are an economic loss—damages—proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself." (*Brandt, supra,*

*Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 454.) It abused its discretion when it decided to use the lodestar method instead. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*) ["'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.'"]; *David v. Hernandez* (2014) 226 Cal.App.4th 578, 590 ["'Where the trial court's decision rests on an error of law, . . . the trial court abuses its discretion.'"].)[12]

---

37 Cal.3d at p. 817.) The lodestar method addresses the recovery of attorney fees as attorney fees, not as damages. "In so-called fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method." (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 26.)

[12] We reject State Farm's reading of *Track Mortgage Group v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 868 for the proposition that the "only proper basis for reversal of a fee award is an award so large or small that it shocks the conscience and suggests that passion or prejudice influenced the result." By contrast, *Track Mortgage* confirms that the applicable standard of review here is abuse of discretion. It does not purport to describe all the ways in which a trial court can abuse its discretion, much less abrogate long-established precedent that a court may abuse its discretion by failing to follow applicable principles of law. (See *Sargon, supra,* 55 Cal.4th at p. 773; *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355.)

Simone next argues that if we determine the trial court abused its discretion by miscalculating the *Brandt* fee award, remand is unnecessary. He urges us to "simply adjust the amount of the *Brandt* fee award so that it is consistent with the calculation method set forth in *Cassim*." According to Simone, all the required factual findings to calculate *Brandt* fees under *Cassim* have already been made. Simone relies on the trial court's finding that "the time spent in [probate court] establishing the right to proceed as plaintiff as Special Administrator is likely not a recoverable *Brandt* fee. The [] probate action was not an action to obtain policy benefits." Based on this finding, Simone contends the trial court determined 92 percent of the total hours (1,135 non-probate hours/1,233 total hours) billed by his attorneys is attributable to the contract recovery. Simone then sets his total compensatory damages at $16,497,919.36 "as of February 8, 2022," resulting in a contingency fee of $7,424,063.71 (45 percent x $16,497,919.36). Simone asserts he is thus entitled to 92 percent of this contingency fee or $6,830,138.62 as *Brandt* fees.

We are not persuaded the trial court made all the necessary findings under *Cassim*. First, the trial court made no allocation finding as between the time counsel spent pursuing contractual recovery and tort recovery. Indeed, Simone did not make that allocation in the underlying papers for *Brandt* fees. The trial court's finding that the 98 hours spent in probate court is not recoverable under *Brandt* does not mean it found all the remaining 1,135 hours were attributed solely to the pursuit of the contract damages. As stated, a cause of action for breach of the implied covenant of good faith and fair dealing "'sounds in both contract and tort.'" (*Johansen, supra,* 15 Cal.3d at p. 18.)

45

Simone could pursue both contract and tort recovery under this one cause of action. (See *Cassim*, *supra,* 33 Cal.4th at p. 808; *Archdale, supra,* 154 Cal.App.4th at p. 467.) But, *Brandt* explains, "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense." (*Brandt, supra,* 37 Cal.3d at p. 817.) Thus, Simone cannot simply argue his attorneys devoted zero hours to the tort recovery merely because "without a tort judgment, there could be no *Brandt* fees." (*Cassim*, at p. 808.) *Cassim* itself acknowledged, "We have no doubt that many bad faith insurance cases involve an identity of several issues, requiring counsel to work simultaneously on tort and contract issues." (*Id.* at p. 811.) That is why an apportionment is necessary.

Second, the trial court made no findings as to the amount of the compensatory damages. In *Cassim*, the two plaintiffs were awarded total compensatory damages of $3,594,600 plus $5 million in punitive damages. (*Cassim, supra,* 33 Cal.4th at p. 805.) Using "numbers similar to the instant case," *Cassim* based its sample calculation on a compensatory damages award of $3,594,600, without reference to interest, costs, or punitive damages. (*Ibid.*) Simone, on the other hand, bases his calculation on a "total recovery of $16,497,919.36 as of February 8, 2022," without extracting his compensatory damages award, interest, or attorney fees from the total.

On remand, Simone has the burden to demonstrate the amount of damages in the form of *Brandt* fees that were proximately caused by State Farm's tortious acts or omissions. (See *Cassim, supra*, 33 Cal.4th at p. 813.) Under *Cassim,* Simone

thus must prove the amount of compensatory damages, how many of the 1,135 non-probate proceeding hours related solely to his pursuit of contractual damages, how many hours related to both contract and tort recovery, and how to fairly apportion the overlapping time. (See *id.* at p. 812.)

## C. *Accrued Interest*

Simone also contends Judge Stern erred when he entered a judgment that adopted Judge Mooney's final statement of decision. Simone contends he is entitled to an additional $1.6 million in prejudgment interest, and Judge Stern should have corrected this "clerical error." As explained below, Simone's contention is unpersuasive.

### 1. *Additional Proceedings*

On March 28, 2017, during the trial against Jameson, Simone made a Code of Civil Procedure section 998 (section 998) offer, which Jameson rejected. Simone then received a judgment that exceeded the amount of his section 998 offer. Code of Civil Procedure section 3291 provides: "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment." (See *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 662, fn. 13.) The judgment against Jameson's estate, entered on August 17, 2018,

stated "interest in [an] amount to be determined at future hearing/s." It made no mention of Code of Civil Procedure section 3291.

On May 10, 2022, before trial in this action, the parties stipulated that "[a]fter the payments by State Farm, the remaining balance of the [Jameson] judgment is $10,917,481, which will continue to accrue interest at 10% percent per annum until the judgment is satisfied in full. The parties agree that since May 14, 2019, interest has been accruing at the rate of $2,991.09 per day." On August 10, 2022, Simone's counsel advised the court on the record that the parties had further stipulated that the total interest accrued to the first day of trial, August 8, 2022, was $4,345,336.

In October 2022, after the trial in this action was completed, Simone moved to renew his 2018 judgment against Jameson's estate. In his application for renewal, Simone included an additional $1.6 million in interest resulting from the rejection of his section 998 offer. The estate did not object to this amount. On April 13, 2023, the judgment against Jameson's estate was renewed and included the additional prejudgment interest of $1.6 million.

In this action, also in October 2022, Simone submitted a proposed judgment that did not include the parties' stipulated accrued interest numbers: "Plaintiff Elijah Simone, in his capacity as Special Administrator for the Estate of Bruce Jameson shall have and recover, and judgment is entered in favor of Plaintiff and against Defendant State Farm Mutual Insurance Company in the amount of the outstanding unpaid underlying judgment in the matter of *Elijah Pomaika Simone vs. Bruce Graham Jameson,* Orange County Superior Court Case

48

No. 30-2016-00832256, plus attorney fees as damages in the amount of $684,841.75. Plaintiff is also entitled to recover 10% interest on the outstanding judgment until this judgment is paid in full." In the filing submitting his proposed judgment, Simone urged the trial court to "set aside the parties' erroneous stipulations."

Judge Stern declined to enter Simone's proposed judgment. He concluded he lacked authority to depart from Judge Mooney's final statement of decision. Accordingly, judgment was entered in this matter on February 8, 2023, in accordance with the parties' stipulations and stated in pertinent part as follows: "The court further finds that plaintiff is entitled to 10% interest, which is stipulated to be $4,345,336 to August 8, 2022, and continuing to accrue interest at a rate of $2,991.09 per day until the judgment is paid in full."

### 2. *Governing Law and Standard of Review*

"A stipulation is 'An agreement between opposing counsel . . . ordinarily entered into for the purpose of avoiding delay, trouble, or expense in the conduct of the action,' [citation] and serves 'to obviate need for proof or to narrow range of litigable issues' [citation] in a legal proceeding." (*County of Sacramento v. Workers' Comp. Appeals Bd.* (2000) 77 Cal.App.4th 1114, 1118 (*County of Sacramento*); *Estate of Burson* (1975) 51 Cal.App.3d 300, 307 ["The stipulation furthers the public policies of settling disputes and expediting trials and is by no stretch of the imagination contrary to the policy of California. On the record here, it simply reflected what the parties agreed the pertinent language meant. The stipulation avoided the necessity

49

of expenditure of the time and money of the parties and the public by removing from the litigation an item not in dispute."].)

"[A] motion to be relieved from a stipulation is addressed to the sound discretion of the trial court, and the trial court's ruling will not be interfered with unless it is apparent that the court has abused its discretion." (*Baker v. Ramirez* (1987) 190 Cal.App.3d 1123, 1135.) "Although precise definition is difficult, the appropriate test of abuse of discretion is whether or not the trial court exceeded ""the bounds of reason, all of the circumstances before it being considered."""" (*In re Marriage of Carter* (1971) 19 Cal.App.3d 479, 494.) "[A] poor outcome is not a principled reason to set aside a stipulation by counsel." (*County of Sacramento, supra,* 77 Cal.App.4th at p. 1121.)

3.      *The Trial Court Did Not Abuse Its Discretion by Declining To Relieve Simone From His Erroneous Stipulation*

Although initially characterized as a "clerical error," Simone concedes he made a mistake by stipulating that $4,345,336 in interest had accrued up until August 8, 2022, for the Jameson judgment, which was the number Judge Mooney used in his final statement of decision and that Judge Stern used in the judgment. Simone acknowledges $4,345,336 is the correct amount of interest that accrued from the date judgment was entered against Jameson to the first day of trial in this action. But he asserts that number does not include the interest to which he is entitled under Code of Civil Procedure section 3291 due to his section 998 offer. Simone contends he should not be bound by an "inaccurate" stipulation and that it should be set aside

50

pursuant to common law authorities and Code of Civil Procedure section 473.[13]

We conclude the trial court did not abuse its discretion when it rejected Simone's request to be relieved of the erroneous stipulation.[14]  *Harris v. Spinali Auto Sales, Inc.* (1966) 240 Cal.App.2d 447 (*Harris*) is instructive.  There, all the parties and attorneys entered into a settlement in open court on the second day of trial after protracted negotiations.  (*Id.* at p. 451.)  The appellant later sought to avoid the agreement by claiming he was mistaken about the value of assets he had agreed to accept as part of the settlement, and in particular that he was "not aware of what the books disclosed" other than what he had been told by others.  (*Id.* at p. 454.)  The trial court denied relief and entered judgment based on the stipulation.  The appellate court affirmed.  *Harris* held the appellant failed to demonstrate relief was justified because there had been "no mistake but merely a lack of full knowledge of the facts" that was "due to the failure of [the appellant] to exercise due diligence to ascertain them." (*Ibid*.)  "When there is no mistake but merely a lack of full

---

[13]     Code of Civil Procedure section 473, subdivision (b), provides in pertinent part:  "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect."

[14]     Although the court rejected Simone's request to deviate from Judge Mooney's final statement of decision because it believed it lacked authority to do so, we review the trial court's ruling, not its reasoning, and may affirm on any ground supported by the record.  (*Davey, supra,* 116 Cal. at pp. 329-330; *Young, supra,* 24 Cal.App.5th at pp. 1192-1193.)

knowledge of the facts, which, as here, is due to the failure of a party to exercise due diligence to ascertain them, there is no proper ground for relief." (*Ibid.*)

*Huston v. Workers' Comp. Appeals Bd.* (1979) 95 Cal.App.3d 856, 861, 863 held a workers' compensation board erred when it allowed an insurer to set aside a stipulation in which it agreed that a worker was entitled to temporary disability pay. *Huston* observed the insurer knew of the worker's trips out of the country, his physical activities, his missed medical appointments, and his new job. At any time before it entered into the stipulation, the insurer could have explored whether the worker was disabled in any capacity. *Huston* concluded there was no basis to release the insurer from the stipulation. (See *id.* at p. 867.)

As in *Harris* and *Huston*, Simone and his counsel failed to exercise due diligence to ascertain the information necessary to enter into an accurate stipulation relating to the amount of interest accrued on the Jameson judgment. At the time Simone informed the trial court about the stipulation, he was represented by counsel described by the court as "excellent." That same counsel represented Simone in his action against Jameson. As in *Huston,* Simone was aware of all the circumstances from which he could determine he was entitled to a greater amount of accrued interest. There is no dispute Simone's counsel was aware of the section 998 offer, Jameson's rejection of the offer, and Simone's entitlement to the prejudgment interest pursuant to Code of Civil Procedure section 3291. Under these circumstances, Simone's lack of diligence when he entered into the stipulation in open court "is no proper ground for relief."

(*Harris, supra,* 240 Cal.App.2d at p. 454.)  The trial court did not abuse its discretion under these circumstances.

For the same reasons, we conclude the trial court did not abuse its discretion by denying relief under Code of Civil Procedure section 473, subdivision (b).  (See *County of Alameda v. Risby* (1994) 28 Cal.App.4th 1425, 1431 ["Since appellant voluntarily entered into a valid stipulation, it would not be an abuse of discretion to deny his motion under section 473."]; *In re Marriage of Carter, supra,* 19 Cal.App.3d at p. 488 [party was bound by the stipulation she ratified and her counsel approved after sufficient discovery had been completed].)

## DISPOSITION

We reverse and vacate the portion of the judgment awarding Simone $684,841.75 in attorney fees.  The matter is remanded to the trial court with directions to determine the amount of *Brandt* fees to which Simone is entitled, consistent with this opinion.  The judgment is otherwise affirmed.  Simone may recover his costs on appeal.

MARTINEZ, P. J.

We concur:

FEUER, J.                                        STONE, J.